**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| AMY HUGHES,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>ANDREW KISELA, Corporal,<br>0203; individually and in his<br>official capacity,<br>*Defendant-Appellee.* | No. 14-15059<br><br>D.C. No.<br>4:11-cv-00366-FRZ<br><br>ORDER AND<br>AMENDED<br>OPINION |

Appeal from the United States District Court
for the District of Arizona
Frank R. Zapata, District Judge, Presiding

Argued and Submitted September 12, 2016
San Francisco, California

Filed November 28, 2016
Amended June 27, 2017

Before: Ronald M. Gould and Marsha S. Berzon, Circuit
Judges, and William K. Sessions III,[*] District Judge.

---

[*] The Honorable William K. Sessions III, United States District Judge
for the District of Vermont, sitting by designation.

Order Amending Opinion;
Order Denying Petition for Rehearing En Banc;
Concurrence in Order Denying Petition for Rehearing En
Banc;
Dissent to Order Denying Petition for Rehearing En Banc;
Opinion by Judge Sessions

## SUMMARY[**]

### Civil Rights

The panel amended the opinion, filed on November 28, 2016, and on behalf of the court denied the petition for rehearing en banc.

In the amended opinion, the panel reversed the district court's summary judgment in favor of a University of Arizona police officer and remanded in a 42 U.S.C. § 1983 action in which plaintiff alleged that the officer used excessive force when he shot her four times.

Judge Berzon, joined by Judge Gould, concurred in the denial of rehearing en banc, and wrote separately to address arguments in Judge Ikuta's dissent from the denial of rehearing en banc.

Judge Ikuta, joined by Judges Kozinski, Tallman, Bybee, Callahan, Bea, and N.R. Smith, dissented from the denial of rehearing en banc because the panel opinion took a path

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

contrary to the Supreme Court's direction on the proper application of the qualified immunity doctrine in the Fourth Amendment context.

## COUNSEL

Vince Rabago (argued), Stacy Scheff, and Norma Kristine Rabago, Vince Rabago Law Office PLC, Tucson, Arizona, for Plaintiff-Appellant.

Robert R. McCright (argued), Assistant Attorney General; Mark Brnovich, Arizona Attorney General; Office of the Attorney General, Tucson, Arizona; for Defendant-Appellee.

## ORDER

The opinion filed November 28, 2016, is amended as follows:

1. At page 14 of the slip opinion, add "(en banc)" after the citation "*Mattos v. Agarano*, 661 F.3d 433, 442 (9th Cir. 2011)."

2. At page 15 of the slip opinion, add a footnote after "this Court remanded *Glenn* for a jury trial." The footnote in the amended opinion should state:

> *Glenn* was decided on summary judgment after the incident that gave rise to this case. It concerned a shooting that occurred in 2006. The panel in *Glenn* concluded that "resolution of . . . [genuine factual] issues is crucial to a

proper determination of the officers' entitlement to qualified immunity," and remanded the question whether the right was clearly established at the time of the alleged misconduct, to be decided "after the material factual disputes have been decided by the jury." 673 F.3d at 871. Although the panel stated that it was "[expressing] no opinion on the second part of the qualified immunity analysis," the remand for trial would have been improper were the officers entitled to qualified immunity on the facts most favorable to the plaintiff. *See Mattos*, 661 F.3d at 445–48, 452. We therefore read *Glenn* as at least suggestive of the state of the clearly established law at the time it was decided.

In any event, we rely on *Glenn* as illustrative, not as indicative of the clearly established law in 2010. *See* Berzon, J., concurring in the denial of rehearing en banc, at 9–12.

3. At page 17 of the slip opinion, delete the "*Glenn* and *Deorle*" and replace it with "*Deorle* and *Harris*."

No new Petition for Panel Rehearing or Petition for Rehearing en Banc will be entertained.

## ORDER

Judges Gould and Berzon voted to deny the petition for rehearing en banc, and Judge Sessions so recommended.

The full court was advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration.  Fed. R. App. P. 35.

The petition for rehearing en banc is **DENIED**.

BERZON, Circuit Judge, with whom GOULD, Circuit Judge, joins, concurring in the denial of rehearing en banc:***

I write separately to address the arguments in Judge Ikuta's dissent from the denial of rehearing en banc.

The dissent's principal complaint is that the panel characterized the relevant constitutional right at too high a level of generality.  That is incorrect.  The dissent proposes that the panel failed adequately to consider the "specific context" of the circumstances facing Corporal Andrew Kisela.  That is mistaken.  And the dissent suggests that qualified immunity is available in an excessive force case only where there is an identical or nearly identical prior case

---

*** Judge William K. Sessions III, a visiting judge from the District of Vermont sitting by designation, was a member of the three-judge panel that decided this case and the author of the Panel's opinion.  Judge Sessions agrees with the views expressed in this opinion.

which held that force was excessive. That understanding is directly contrary to the Supreme Court's repeated recognition that no case is likely to be directly on point factually, so the qualified immunity inquiry must be whether existing precedent places the constitutional question beyond debate.

1. The Supreme Court has indeed advised lower courts construing claims of qualified immunity in excessive force cases "not to define clearly established law at a high level of generality." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). The import of that instruction is, as the Court has explained, that "doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Id*. The panel's opinion could not reasonably be characterized as avoiding that "crucial question." Nor, in defining the relevant constitutional right at issue, did the panel rely simply on the general, abstract principle set forth in *Tennessee v. Garner*, 471 U.S. 1 (1985), that "deadly force is only permissible where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others," as the Supreme Court has cautioned us not to do. *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015) (per curiam) (citation omitted). Nowhere did the panel define the relevant right as the "right to be free of excessive force," as the dissent incorrectly asserts in its opening lines.

Instead, the panel held that our precedents clearly established a far more specific constitutional right: that under the Fourth Amendment, a mentally disturbed individual who had committed no known crime, was not acting erratically when encountered by police, and presented no objective threat to officers or third parties may "walk down her

driveway holding a knife without being shot." *Hughes v. Kisela*, 841 F.3d 1081, 1090 (9th Cir. 2016). Taking the facts in the light most favorable to Hughes, that is what happened in this case. On those facts, the panel held, no reasonable police officer could have thought that shooting Hughes was constitutionally permissible.

The inverse of a "high level of generality" is not, as the dissent suggests, a previous case with facts identical those in the instant case – because, of course, no two cases are exactly alike. The Supreme Court has repeatedly stated that "[w]e do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix*, 136 S. Ct. at 308 (quoting *al-Kidd*, 563 U.S. at 741); *see also White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam). Were the rule otherwise, as we have previously observed, "officers would escape responsibility for the most egregious forms of conduct simply because there was no case on all fours prohibiting that particular manifestation of unconstitutional conduct." *Deorle v. Rutherford*, 272 F.3d 1272, 1286 (9th Cir. 2001). "If qualified immunity provided a shield in all novel factual circumstances, officials would rarely, if ever, be held accountable for their unreasonable violations of the Fourth Amendment." *Mattos v. Agarano*, 661 F.3d 433, 442 (9th Cir. 2011) (en banc). It is thus "clear that officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

Consider, for example, the hypothetical case of a policeman who happens upon someone standing outside a house using a kitchen knife to chop onions at a summer barbecue, while chatting amicably with another woman

standing close by. The policeman draws his weapon and, twice in rapid succession, orders the individual holding the knife to drop it; when she does not immediately comply, the policeman opens fire within a few seconds and shoots the individual four times. There is no precedential case with these precise facts (although this case, when the facts are viewed in the light most favorable to Hughes, is not far off), yet our precedents as well as common sense would place beyond debate the question of whether that officer acted lawfully.

In the absence of a precedential case with precisely the same facts as the case before us, we must compare the specific *factors* before the responding officers with those in other cases to determine whether those cases would have put a reasonable officer on notice that his actions were unlawful.[1]

---

[1] *Mullenix*, on which the dissent places great emphasis, is wholly consistent with the analysis I identify here. *See also City & Cty. of San Francisco. v. Sheehan*, 135 S. Ct. 1765, 1776–77 (2015). The Supreme Court did not limit its qualified immunity analysis in *Mullenix* to the question of whether *some* facts distinguished *Mullenix* from the Court's most analogous precedents involving excessive-force claims in high-speed car chases, namely *Plumhoff*, *Scott v. Harris*, 550 U.S. 372 (2007), and *Brosseau v. Haugen*, 543 U.S. 194 (2004). Instead, the Court compared the factors relevant to the excessive-force inquiry in each case (emphasizing, in its analysis, the potential threat posed by the suspects in each case). *Mullenix*, 136 S. Ct. at 309–10. The Court concluded that "[t]he threat . . . posed was at least as immediate as that" in *Brosseau*, and that although the suspect in *Mullenix* passed fewer cars than those in *Plumhoff* and *Scott*, he had also expressly threatened to kill any police officers in his path. *Id*. at 310. In short, in coming to its conclusion that Mullenix did not violate clearly established law, the Court considered the specific facts of the case, compared those facts to the relevant facts in available precedential cases (with a heavy focus on the threat presented), and weighed whether those precedents would have placed a reasonable officer in Mullenix's position on notice that his actions were unlawful –

That framework is precisely the one the panel applied to Kisela's claim of qualified immunity. After conducting that inquiry, the panel concluded that this case is, given the pertinent precedents, squarely within – indeed, at the more egregious border of – the group of precedents in which excessive force was found.

2. That conclusion was correct.

We have held unconstitutional the use of deadly force where an individual "did not point [a] gun at the officers and apparently was not facing them when they shot him the first time." *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991). We have also held that deadly force is impermissible against an armed suspect "who makes no threatening movement" or "aggressive move of any kind," even where that suspect is suspected of killing a federal agent. *Harris v. Roderick*, 126 F.3d 1189, 1203 (9th Cir. 1997). "Law enforcement officers may not shoot to kill unless, *at a minimum*, the suspect presents an immediate threat to the officer or others, or is fleeing and his escape will result in a serious threat of injury to persons." *Id.* at 1201 (emphasis added). We have held that a reasonable jury could find a constitutional violation, even concerning the use of nondeadly force, where an arrestee never attacked or even threatened to attack a police officer. *Smith v. City of Hemet*, 394 F.3d 689, 703–04 (9th Cir. 2005) (en banc). And we have held that "[e]very police officer should know that it is objectively unreasonable to shoot . . . an unarmed man who: has committed no serious offense, is mentally or emotionally disturbed, has been given no warning of the imminent use of such a significant degree of force, poses no risk of flight, and

---

precisely what the panel did in this case.

presents no objectively reasonable threat to the safety of the officer or other individuals," even where that individual had previously brandished weapons and threatened to "kick [a police officer's] ass." *Deorle*, 272 F.3d at 1277, 1285.

On the other side of the ledger, we have held that it is constitutionally permissible to shoot an armed, mentally disturbed individual who makes threatening movements; commits a nonviolent crime in view of police; is warned to drop his weapon and that he will be shot if he does not comply; not only ignores those commands but apparently "flaunt[s]" them; and then attempts to enter a private residence for which he has no key. *Blanford v. Sacramento Cty.*, 406 F.3d 1110, 1113, 1116–19 (9th Cir. 2005).

Taken together, our precedents as of May 21, 2010 suggest several factors critical to the constitutional analysis. These include the severity of the underlying crime, if any; whether the individual against whom force is used was armed, and if so, whether her movements suggested an immediate threat; whether a warning has been issued, if practicable, and particularly whether she has been warned of the imminent use of a significant degree of force; whether she complies with such warnings, ignores them, or actively flaunts them; whether she poses a risk of flight; whether she is mentally or emotionally disturbed; and whether she makes any threatening statements. None of these factors is dispositive, but each is relevant.

3. I turn, then, to the facts of this case taken in the light most favorable to Hughes, as we must do at the summary judgment stage. *Tolan v. Cotton*, 134 S. Ct. 1861, 1868 (2014) (per curiam). Kisela and two other police officers arrived at Hughes's residence in response to a "check welfare" call –

not a report of a crime or a threatened crime. The call reported that a woman matching Hughes's description was seen hacking at a tree with a large knife.

Hughes emerged from her house holding a kitchen knife – an everyday household item which can be used as a weapon but ordinarily is a tool for safe, benign purposes. Although the dissent makes much of Hughes's "reportedly erratic" behavior, Hughes's demeanor when Kisela encountered her was in fact "composed and content," not "erratic," as she exited her home and walked down her driveway. She engaged in conversation with another woman, Sharon Chadwick, the content of which Kisela did not hear. The only officer who did hear Hughes speak stated that she seemed "unfocused," but was not shouting and did not appear angry.

The police did not observe Hughes making any verbal threats toward Chadwick or the police (who were safe behind a gated fence). Nor did Hughes raise the knife from her side, or make any threatening or aggressive movements. After initially approaching Chadwick, Hughes periodically walked *away* from Chadwick before reapproaching. Kisela and the other officers ordered Hughes to drop the knife, but the officers received no indication that Hughes heard them, as she did not acknowledge their presence. At no time did any officer orally identify himself or herself as police (although they were in uniform), nor did they warn Hughes that they would shoot if she did not comply with their commands to

drop the knife.**²**  Nevertheless, within seconds after Hughes stepped out of her house, Kisela shot her four times.

On these facts – many of which the dissent elides or ignores – no officer could have reasonably believed in light of our precedents that Hughes's conduct justified the use of lethal force.  As we held in *Deorle*, "[e]very police officer should know" that it is objectively unreasonable to shoot an unarmed, mentally disturbed person who has been given no warning about the imminent use of serious force, poses no risk of flight, and presents no objective imminent threat to the safety of others – even where that person had committed a minor criminal offense and threatened to assault a police officer, neither of which Hughes had done.  272 F.3d at 1285.

It is true that Hughes, unlike Deorle, held a kitchen knife. But it was down at her side, and she did not verbally threaten

---

**²**  We have held, based on longstanding Supreme Court precedent, that "whenever practicable," such a warning "must be given before deadly force is employed." *Harris*, 126 F.3d at 1201–02 (citing *Garner*, 471 U.S. at 11–12).  We have recently held, in a factual situation quite similar to that presented here, that a failure to warn a suspect that he would be fired upon if he did not comply with police instructions is an important factor in determining the reasonableness of force.  *See Hayes v. Cty. of San Diego*, 736 F.3d 1223, 1234–35 (9th Cir. 2013).  Hayes, like Hughes, was holding a knife; he was standing six feet away from San Diego County sheriff's deputies (roughly the same distance separating Hughes and Chadwick) and was walking toward them when the deputies opened fire. We held that "seen in the light most favorable to [the nonmoving party]," Hayes "posed no clear threat at the time he was shot without warning." *Id*. at 1235.  *Cf. White*, 137 S. Ct. at 551, 552 (qualified immunity is warranted if an officer who arrives late on the scene and sees a suspect pointing a firearm at him could reasonably assume that proper police procedures such as officer identification and warning had already occurred).

to "kick [a police officer's] ass" as Deorle did, nor did police have any basis for thinking she had committed a crime. *Id*. at 1277. Our case law clearly establishes that the use of deadly force against a suspect simply because he is holding a gun – even when that suspect is in proximity to police officers or other individuals, and even when that suspect has "committed a violent crime in the immediate past"– is not *ipso facto* reasonable, particularly when that gun is not pointed at another individual or otherwise wielded in a threatening fashion. *Harris*, 126 F.3d at 1203–04; *Curnow*, 952 F.2d at 325. Hughes was holding a kitchen knife – again, an item that can be used as a weapon but normally is not – not a gun. And on the facts favorable to Hughes, she never raised her knife, pointed it toward Chadwick, made any verbal threats, or moved in a threatening manner toward Chadwick.

Judge Ikuta's emphasis on Hughes's "reportedly erratic" behavior is crucial to the dissent's formulation of what it considers to be the relevant alleged constitutional right in this case. *See* Dissent at 22 ("The panel should have considered the alleged violation as: shooting a *reportedly erratic*, knife-wielding woman who comes within striking distance of a third party, ignores multiple [actually two] orders to drop her weapon, and cannot otherwise be timely subdued due to a physical barrier separating her from the officer.") (emphasis added). The "erratic" characterization is quite a thin reed upon which to base a claim of qualified immunity, as the facts seen in the light most favorable to Hughes make clear that she did *not* act erratically once the officers arrived. Instead, she was "composed and content" and did *not* appear angry or disturbed.

It is certainly true that Hughes's earlier, reportedly "erratic," behavior toward a tree could be construed as an

indicator of mental instability.  But there is no basis in our case law for treating mental illness as an *aggravating* factor in evaluating the reasonableness of force employed.  To the contrary, we have held that the apparent mental illness of a suspect weighs, if anything, in the opposite direction.  *See Deorle*, 272 F.3d at 1283, 1285.  The approach proposed in the dissent suggests the reverse: that an officer's use of deadly force is *more* reasonable where that officer is aware of an individual's mental instability.  That approach not only violates our previous refusal "to create two tracks of excessive force analysis, one for the mentally ill and one for serious criminals," *Bryan v. MacPherson*, 630 F.3d 805, 829 (9th Cir. 2010), but turns *Deorle* on its head.

4.  It is the dissent from denial of en banc consideration, not the panel opinion, that ignores the "specific context" in reaching its conclusion, despite the longstanding principle that at the summary judgment stage we are to make all reasonable inferences in favor of the nonmoving party. *Tolan*, 134 S. Ct. at 1868.

The dissent identifies four facts in maintaining that qualified immunity should have been granted – that Hughes held a kitchen knife in her hand, that she was within five or six feet of another woman, that she was "reportedly erratic," and that she did not respond to two commands to drop the knife – to the exclusion of all other relevant circumstances and context.  For example, the dissent ignores that Hughes held the knife calmly at her side, and did not raise it.[3]  It

---

[3]  The dissent incorrectly characterizes Hughes as "wielding" the knife, a term that suggests she had it in position for use as a weapon.  *See* 20 Oxford English Dictionary 323–24 (2nd ed. 1989) (defining current sense of "to wield" as "[t]o use or handle with skill and effect; to manage,

ignores that Hughes was not suspected of having committed a crime. It ignores that Hughes made no threatening movements or statements. It ignores that Kisela, on the facts most favorable to Hughes, gave two warnings in quick succession, after failing to identify himself as a police officer and without any warning that he would open fire if Hughes did not comply with his instructions.

The dissent ultimately proposes that Kisela was entitled to qualified immunity for shooting Hughes because one purportedly analogous case, *Blanford*, found no constitutional violation. As the panel held, *Blanford* is simply inapposite. Several critical distinctions between the facts here and those present in *Blanford* confirm that a reasonable officer would not view *Blanford* as condoning the Hughes shooting.

At the time he was shot, Blanford was carrying a two-and-a-half foot sword. *Blanford*, 406 F.3d at 1112–13. Swords, of course, are meant as weapons. In contrast, all the while the officers were present, Hughes was holding a large kitchen knife at her side; such a knife certainly *can* serve as a weapon but is usually employed as an ordinary culinary tool. In Blanford's case, the officers specifically identified themselves as law enforcement officials. *Id*. Kisela and the other officers did not do so orally. Officers expressly warned Blanford – repeatedly – that they would shoot him if he did not comply with orders to drop the sword. *Id*. at 1116–17,

_____

actuate, ply (a weapon, tool, or instrument, now always one held or carried in the hand"); Webster's New International Dictionary of the English Language 2924 (2nd ed. 1959) (defining "wield" as "[t]o use (an instrument, implement, etc.) with full command or power; to handle with skill, effectiveness, etc.; to employ, manipulate, or ply."). Hughes was just carrying a kitchen knife; she was not using it "with skill and effect," or actuating, plying, or employing it, as a weapon.

1119. Hughes received no such warning, although such a warning is required "where feasible." *Garner*, 471 U.S. at 11–12. *After* that warning, Blanford "appeared to flaunt the deputies' commands," as he then raised his sword and roared in a threatening manner. *Id.* at 1113, 1119. Hughes did not raise her knife from her side, and Kisela did not hear her say anything at all, much less roar in a threatening way. Blanford ignored repeated police commands over the course of roughly two minutes. *Id.* at 1114. Hughes was gunned down within thirty to forty-five seconds of Officer Kisela's arrival. Blanford had committed a (nonviolent) crime witnessed by the officers present. *Id.* at 1113, 1116. The officers here did not see Hughes commit any crime. Blanford was seen attempting to enter a private residence for which he had no key, facts probative of a possible home invasion. Here, the officers had no reason to think Hughes was entering someone else's house. She emerged from a house into a yard, and there was no reason to think it was not her house (which it was). No reasonable officer could conclude, even mistakenly, that *Blanford* sanctioned the shooting of Amy Hughes in this case.

In short, the panel opinion is a routine application of established qualified immunity principles to a set of facts that, under the applicable precedents, any reasonable officer should have realized did not justify the use of deadly force. Of course there was no precedent with *precisely* the same facts, but there nearly never is. On the dissent's approach, officers using excessive force would just about never be liable for doing so.

Indeed, the more egregious the use of excessive force, the less likely it is that deadly force would have been used in a closely similar situation, and the *more* likely is a grant of

qualified immunity on the dissent's analysis. It is true that we could find no case in which a court held deadly force excessive where there was no threat made, verbally or physically, to anyone, and no crime committed. But almost surely that is because no reasonable officer would use deadly force under those circumstances.

I concur in the denial of rehearing en banc.

IKUTA, Circuit Judge, with whom KOZINSKI, TALLMAN, BYBEE, CALLAHAN, BEA, and N. R. SMITH, Circuit Judges, join, dissenting from denial of rehearing en banc:

The panel opinion that we let stand today directly contravenes the Supreme Court's repeated directive not to frame clearly established law in excessive force cases at too high a level of generality. *See, e.g.*, *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam). Rather than ask the correct question—whether Officer Kisela's split-second decision in "the specific context of the case" was "plainly incompetent" or "knowingly violate[d] the law"—the panel opinion defines the "clearly established right" here at the highest level of generality: the right to be free of excessive force. *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam). In doing so, the panel opinion adopts the same standard that the Supreme Court has repeatedly overruled. *Compare id.* at 309 ("The general principle that deadly force requires a sufficient threat hardly settles this matter."), *with Hughes v. Kisela*, 841 F.3d 1081, 1089 (9th Cir. 2016) (holding that the "most important[]" question is "whether it was reasonable to believe that Ms. Hughes presented a threat"). Because the panel opinion takes a path contrary to the Supreme Court's

direction on the proper application of the qualified immunity doctrine in the Fourth Amendment context, I would take this case en banc to correct the panel opinion's error.

I

The relevant facts necessary to resolve the qualified immunity analysis are not in dispute.  On May 21, 2010, Andrew Kisela was a corporal with the University of Arizona Police Department.  That evening, he and his colleague received a radio report that a woman was walking down 7th Street in Tucson and hacking at a tree with a large knife.  Upon arrival at the scene, Officer Kisela spoke briefly with the reporting party, and eventually a third officer arrived at the scene.

Against this backdrop, the incident at the center of this lawsuit unfolded in the course of thirty to forty-five seconds.  Officer Kisela saw Amy Hughes—a woman matching the description of the tree-hacker—walking toward a third party, now known to be Hughes's housemate Sharon Chadwick.  Hughes was still holding the large knife, so the officers present drew their guns and ordered Hughes to drop the knife at least twice.  Hughes failed to comply.  Instead, she continued to approach Chadwick, and in fact came close enough to Chadwick to deliver a blow with the knife.  With a chainlink fence separating the officers from Hughes and Chadwick, and with insufficient time to transition from his firearm to his taser, Officer Kisela fired four shots at Hughes, striking but not killing her.

Amy Hughes then filed this suit against Officer Kisela pursuant to 42 U.S.C. § 1983, alleging that Officer Kisela violated her Fourth Amendment right to be free of excessive

force. The district court granted summary judgment for Officer Kisela, which the panel hearing this appeal reversed.

## II

The dispositive question here is whether Officer Kisela is entitled to qualified immunity. As the Supreme Court has explained, the qualified immunity analysis has two prongs: In order to deny qualified immunity, the facts must establish a violation of a constitutional right, and that right must have been "clearly established" at the time of alleged violation. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). We may assess the prongs in either order, "in light of the circumstances in the particular case at hand." *Id.* at 236.

In a Fourth Amendment excessive force case, we analyze the first prong by engaging in "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). This is a "totality of the circumstances" analysis that we conduct from the perspective of a reasonable officer on the scene. *Id.* The analysis is accordingly quite deferential to the officer. *See Saucier v. Katz*, 533 U.S. 194, 205 (2001).

But the test for the second prong of the qualified immunity analysis is different and adds another layer of deference. *See id.* For excessive force cases in particular, the Supreme Court has identified two key principles about what constitutes a "clearly established" right. First, courts must define the alleged constitutional violation in terms of the officer's "*particular* conduct." *Mullenix*, 136 S. Ct. at 308 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). As

*Mullenix* explained, "[s]uch specificity is especially important in the Fourth Amendment context, where the Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Id.* (quoting *Saucier*, 533 U.S. at 205) (second alteration in original). Thus, courts may not define the clearly established right at a high level of generality that covers a wide range of conduct, as that would "mak[e] it impossible for officials reasonably [to] anticipate when their conduct may give rise to liability for damages." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (quotation marks omitted) (second alteration in original).

Second, having identified the context-specific conduct that allegedly violated the Constitution, courts must determine whether any precedent existing at the time placed *beyond debate* that the use of force in such circumstances violated the Fourth Amendment. *See, e.g.*, *White*, 137 S. Ct. at 551; *Mullenix*, 136 S. Ct. at 308. The "beyond debate" standard is a high one: Officers are entitled to qualified immunity unless "every reasonable official"—which excludes only the plainly incompetent and those who knowingly violate the law—"would have understood that what he is doing violates [the plaintiff's] right." *Mullenix*, 136 S. Ct. at 308 (quoting *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012)). And officers remain entitled to qualified immunity even if they make "reasonable mistakes" about "the legal constraints on particular police conduct." *Saucier*, 533 U.S. at 205. Given this high standard, the Supreme Court has made clear that an official can lose qualified immunity in the excessive force context only if an earlier case held that conduct closely analogous to the specific conduct at issue violated a constitutional right. *E.g.*, *Mullenix*, 136 S. Ct. at

308.  For example, the Court recently held that the Tenth Circuit "misunderstood the 'clearly established' analysis" when it "failed to identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment," and instead relied on cases that "lay out excessive-force principles at only a general level." *White*, 137 S. Ct. at 552.

*Mullenix* illustrates both key principles of the second prong of the qualified immunity analysis.  The officer in *Mullenix* was sued for using excessive force after he shot and killed an individual evading an arrest warrant who was speeding down the interstate.  136 S. Ct. at 306–07.  The officer's objective was to disable the fleeing man's car by shooting it from an overpass, a tactic that the officer had neither been trained in nor previously attempted.  *Id.* at 306. In evaluating whether the officer violated clearly established law, the Court first explained the alleged violation in terms of the officer's specific conduct:  The officer "confronted a reportedly intoxicated fugitive, set on avoiding capture through high-speed vehicular flight, who twice during his flight had threatened to shoot police officers, and who was moments away from encountering an officer." *Id.* at 309.

After identifying this context-specific conduct, the Court then stated that "[t]he relevant inquiry is whether existing precedent placed the conclusion that [the officer] acted unreasonably in these circumstances 'beyond debate.'" *Id.* (quoting *al-Kidd*, 563 U.S. at 741).  The Court concluded that it had "never found the use of deadly force in connection with a dangerous car chase to violate the Fourth Amendment, let alone to be a basis for denying qualified immunity." *Id.* at 310.  Because no Supreme Court case "squarely govern[ed]" the facts of *Mullenix*, *id.*, and lower court decisions left the

question hazy, *id.* at 312, the Court could not say that it was "beyond debate" that the officer violated the plaintiff's constitutional right, *id.* (quoting *Stanton v. Sims*, 134 S. Ct. 3, 7 (2013) (per curiam)). Therefore, the officer was entitled to qualified immunity. *Id.*

## III

The panel opinion directly contravenes the qualified immunity principles relevant to the "clearly established" inquiry. By doing so, the panel opinion fails to heed the central lesson of *White*, *Mullenix*, and multiple other Supreme Court decisions in the excessive force context.

First and most fundamentally, the panel opinion fails to define the alleged constitutional violation in terms of the officer's "*particular* conduct." *Mullenix*, 136 S. Ct. at 308 (quoting *al-Kidd*, 563 U.S. at 742). The panel should have considered the alleged violation as: shooting a reportedly erratic, knife-wielding woman who comes within striking distance of a third party, ignores multiple orders to drop her weapon, and cannot otherwise be timely subdued due to a physical barrier separating her from the officer. Instead, the panel defines the alleged violation at issue as shooting a plaintiff who "present[ed] no objectively reasonable threat to the safety of the officer or other individuals," *Hughes*, 841 F.3d at 1089 (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1285 (9th Cir. 2001)), and focuses solely on whether Officer Kisela was unreasonable in determining that Hughes posed a threat.[1] By defining the conduct at issue at such a

---

[1] According to the panel, this is the "most important[]" aspect of the qualified immunity determination because if the issue is determined in Hughes's favor, "then Corporal Kisela clearly violated [Hughes's]

high level of generality, the panel adopts the exact erroneous approach reversed in *Mullenix*, among other cases; it focuses only on the general elements of an excessive force violation. The abstract legal principle that an officer may not use deadly force when a suspect does not present an objectively reasonable threat is well established. *See, e.g.*, *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). But the proper question for purposes of identifying a "clearly established" right is whether any precedent placed beyond debate how this legal principle applies to the specific facts on the ground in this case. *See Mullenix*, 136 S. Ct. at 309. As the Supreme Court has made clear, at the second prong of the qualified immunity analysis we are not to focus on the reasonableness of the officer's conduct, but on whether the officer could reasonably have thought that the law permitted his specific conduct under the facts of the case. *See Saucier*, 533 U.S. at 205.

The opinion also mishandles the Court's second key principle for identifying clearly established law because it "fail[s] to identify a case where an officer acting under similar circumstances as Officer [Kisela] was held to have violated the Fourth Amendment." *White*, 137 S. Ct. at 552. Indeed, by relying on *Glenn v. Washington County*, 673 F.3d 864 (9th Cir. 2011), the panel tacitly admits that no precedent squarely governed these facts at the time of the officer's conduct. *Glenn*, which the panel calls "[t]he most analogous Ninth Circuit case," *Hughes*, 841 F.3d at 1088, post-dates the

---

constitutional right." *Hughes*, 841 F.3d at 1089. Obviously, this part of the panel's analysis is relevant only to the first prong of the qualified immunity inquiry: whether the facts establish a violation of a constitutional right. But this is not the appropriate inquiry at the second prong, where the question is whether precedent placed "beyond debate" that the officer's "*particular* conduct" was unlawful "in light of the specific context of the case." *Mullenix*, 136 S. Ct. at 308.

conduct at issue by more than a year. Needless to say, a case that was decided after Officer Kisela acted could not have informed his conduct, and so is "of no use in the clearly established inquiry." *Brosseau v. Haugen*, 543 U.S. 194, 200 n.4 (2004) (per curiam).**[2]**

And indeed, no case that the panel cites held that conduct closely analogous to the conduct at issue in this case violated the plaintiff's constitutional rights. The panel's reliance on *Deorle*, *see Hughes*, 841 F.3d at 1089, is misplaced. In *Deorle*, we held that there was "no objectively reasonable threat to the safety of the officer or other individuals," 272 F.3d at 1285, where an unarmed man, *id.*, who had been compliant with at least three police requests to discard weapons, *id.* at 1276–77, was shot while walking toward an officer with a clear path of retreat, *id.* at 1282, while "the only neighbors in the vicinity, along with the other police officers, were safely behind [] two roadblocks," *id.* Given these facts, *Deorle* "does not clearly dictate the conclusion that [Officer Kisela] was unjustified in perceiving grave danger and responding accordingly" in the situation at issue here. *Mullenix*, 136 S. Ct. at 311. In stark contrast to *Deorle*, Officer Kisela was present at the scene for only a matter of seconds, while the officer in *Deorle* had been on the scene for forty minutes and had observed the victim "for about five to

---

**[2]** After we dissenting judges pointed out that *Glenn* was decided more than a year after the incident in this case, the panel belatedly amended its opinion to retreat from its reliance on *Glenn*. *See* Amended Op. at 44 n.2. But having now conceded that the panel's "most analogous Ninth Circuit case," *id.* at 43, is merely "suggestive of the state of the clearly established law," and serves only "as illustrative" rather than "as determinative of clearly established law," *id.* at 44 n.2, the panel opinion more clearly than ever rests on nothing but the general rule that deadly force requires an objective threat of harm.

ten minutes from the cover of some trees." *Deorle*, 272 F.3d at 1277, 1281–82. Hughes was not only armed (unlike Deorle), but also refused at least two requests to drop her knife (again unlike the largely compliant Deorle). Likewise, Hughes was within striking distance of a third party while separated from the officers by a physical barrier, and Officer Kisela had been put on notice of Hughes's earlier erratic behavior with a knife, which Officer Kisela had been dispatched to investigate. Shooting an armed, unresponsive, and reportedly erratic woman as she approaches a third party is materially different from shooting an unarmed, largely compliant man as he approaches an officer with a clear line of retreat. On its facts, therefore, *Deorle* does not place "beyond debate" that Officer Kisela's conduct violated Hughes's Fourth Amendment rights. *al-Kidd*, 563 U.S. at 741.

Worse yet, the panel's reliance on *Deorle* repeats the exact same error for which the Supreme Court reprimanded us just two years ago in *Sheehan*, in which the Court noted that the differences between *Deorle* and the situation confronting the officers in *Sheehan* "leap[t] from the page." *City & County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1776 (2015). For reasons just discussed, the same is true here. The Supreme Court went on to hold that, even if *Deorle* supported the general rule that an officer's forcible entry into a mentally ill individual's home requires an objective need for immediate entry, qualified immunity was appropriate because "*no precedent clearly established that there was not 'an objective need for immediate entry.'*" *Id.* at 1777 (emphasis in original). As in *Sheehan*, the panel here uses *Deorle* to justify denial of qualified immunity based on a violation of a general Fourth Amendment principle that deadly force requires an objective threat, without citing a

single relevant case in which *any* court has held that there was not an objective threat on facts comparable to those here.

The panel further exacerbates its error by brushing aside Officer Kisela's argument that a reasonable officer could rely on *Blanford v. Sacramento County*, 406 F.3d 1110 (9th Cir. 2005), to justify the use of force in this situation. It is irrelevant whether *Blanford* is distinguishable, as the panel claims. *Hughes*, 841 F.3d at 1090. The issue is not whether *Blanford* compels the conclusion that Officer Kisela's conduct does not rise to the level of a constitutional violation (the first prong of the qualified immunity analysis). Rather, the question is whether any reasonable officer could have understood *Blanford*, rightly or wrongly, as permitting the use of deadly force in this situation. *See Saucier*, 533 U.S. at 205. On that score, the panel errs.

In *Blanford*, the officers confronted a man "wearing a ski mask and carrying a sword" walking through a suburban neighborhood and "behaving erratically." 406 F.3d at 1112. Over the course of approximately two minutes, *id.* at 1114, the officers trailed Blanford and repeatedly ordered him to drop the sword, which he did not do, *id.* at 1112–13. The officers "considered whether Blanford might be mentally disturbed," but they believed that he "posed an imminent threat" to the public and that they needed to secure his weapon, even though no third parties were known to be in the vicinity. *Id.* at 1113. When Blanford attempted to enter his own home, the officers—unaware that it was Blanford's home, and not knowing whether anyone was inside the home—shot him and severed his spine. *Id.* at 1113–14. We held that no constitutional violation occurred. *Id.* at 1117–18. More specifically, we identified the four elements of the situation that supported our holding: "[1] [Blanford] was

armed, [2] refused to give up his weapon, [3] was not surrounded, and [4] was trying to get inside a private residence . . . where his sword could inflict injury that the deputies would not then be in a position to prevent." *Id.* at 1117–18.

Despite the panel's efforts to distinguish *Blanford*, *see Hughes*, 841 F.3d at 1090, the four elements that compelled our conclusion in *Blanford* are present in this case, and it is therefore clear that Officer Kisela could have reasonably relied on *Blanford* to justify his use of force against Hughes. *Cf. Mullenix*, 136 S. Ct. at 311 (looking to comparable decisions from the circuit courts to determine whether an officer's assessment of a threat was reasonable); *Shinault v. Hawks*, 782 F.3d 1053, 1060 (9th Cir. 2015) (holding that "qualified immunity is appropriate" where "some courts" held that no violation of a constitutional right occurred "in analogous cases," as this "shows that the right was not clearly established at the time of conduct"). Just as in *Blanford*, Hughes was armed, refused to drop her weapon, was not surrounded, and was attempting to put herself in a situation where she could have caused harm that the officers would not have been able to prevent. *See* 406 F.3d at 1117–18. Given our holding in *Blanford*, Officer Kisela could reasonably have thought that his conduct was lawful. For qualified immunity purposes, that is dispositive. *See Saucier*, 533 U.S. at 205.

Finally, the panel attempts to rescue its ruling by arguing that it should have been obvious to Officer Kisela that he could not use deadly force in this context. *Hughes*, 841 F.3d at 1090 (citing *Brosseau*, 543 U.S. at 199, which held that "in an obvious case," general Fourth Amendment standards "can 'clearly establish' the answer, even without a body of relevant case law"). In effect, the panel's argument here is that

Officer Kisela's conduct constituted excessive force under general Fourth Amendment principles, and it is obvious that an officer may not use excessive force. *See id.* (characterizing as "obvious" that Hughes "had a constitutional right to walk down her driveway holding a knife without being shot"). Given that Hughes, as the panel acknowledges, "may have been acting erratically, was approaching a third party, and did not immediately comply with orders to drop the knife," *id.*, this is far from an obvious case. Indeed, if this case is obvious—especially in light of precedents like *Blanford*—then the "obvious case" exception will have swallowed the rule to identify a case that "squarely governs" the situation confronting the officer. *Mullenix*, 136 S. Ct. at 310.

All told, the panel opinion denies qualified immunity on the authority of a general Fourth Amendment principle, a post-dated case, and a wholly unpersuasive attempt to distinguish a precedent that held, on comparable facts, that no constitutional violation occurred. These errors are easily perceived, and we ought to have corrected them.

## IV

The concurrence's last ditch effort to salvage the panel opinion is to no avail. *See* Concurrence to Denial of Rehearing En Banc. Of course, a concurrence is not the opinion of the court, and is not a means by which this court can definitively speak on legal questions.[3] Moreover, the

---

[3] As some of our colleagues on the Fifth Circuit recently observed, although a panel publishing a response to denial of rehearing en banc has "the right to comment on the dissent from denial," it cannot "articulate any additional binding precedent." *EEOC v. Bass Pro Outdoor World, LLC*,

concurrence has no better luck than the panel in identifying precedent pre-dating Officer Kisela's use of force that is close enough to the situation facing Officer Kisela that only a plainly incompetent or lawless officer would know that his actions were unconstitutional. *See Mullenix*, 136 S. Ct. at 308.

First, the concurrence claims that this case is quite like *Harris v. Roderick*, 126 F.3d 1189 (9th Cir. 1997), which addressed the infamous 1992 siege at Ruby Ridge. *See* Concurrence at 9, 13.[4] But the suggestion that Officer Kisela ought to have known that his conduct was unlawful because we held in the wake of Ruby Ridge that a sniper ensconced safely on a hill cannot shoot a retreating suspect merely because that suspect had committed a crime *the day before*, *see Harris*, 126 F.3d at 1203, does not pass the straight-face test. At a minimum, *Harris* does not place it "beyond debate" that Officer Kisela violated the Constitution by using deadly force against a person who had been reported as acting erratically with a knife *minutes* before the encounter, was still armed with the knife, failed to respond to at least two orders to drop the knife, and was within striking distance of a third party. *White*, 137 S. Ct. at 551.

No. 15-20078, — F.3d —, 2017 WL 1540853, at *14 (5th Cir. Apr. 28, 2017) (Jones, J., dissenting from denial of rehearing en banc) (emphasis omitted).

[4] The panel follows suit by amending the opinion to remove a cite to *Glenn* and replace it with a cite to *Harris*, albeit without any explanation. *Compare Hughes*, 841 F.3d at 1090 ("As indicated by *Glenn* and *Deorle*, . . . ."), *with* Amended Op. at 47 ("As indicated by *Deorle* and *Harris*, . . . .").

Equally unconvincing is the concurrence's reference to *Curnow ex rel. Curnow v. Ridgecrest Police*, 952 F.2d 321 (9th Cir. 1991). *See* Concurrence at 9, 13. On the facts as we assumed them in *Curnow*, the victim was sitting in his home, unarmed, and holding his girlfriend in his lap when a police officer shot him in the back through a window. *Id.* at 323. Whatever wisdom *Curnow* may impart to a policeman observing a person chopping onions at an innocent backyard barbecue, *see* Concurrence at 7–8, it does not clearly establish the unreasonableness of deadly force where a reportedly erratic individual who is unresponsive to police commands approaches a third party, knife in hand.

Finally, the concurrence points to distinctions between the facts of this case and those in *Blanford*, such as the length of the blade Blanford carried, the fact that the police shouted "we'll shoot" to Blanford in addition to an order to drop the weapon, and the length of the encounter (two minutes in *Blanford* rather than forty-five seconds in this case).[5] Concurrence at 15–16. Such distinctions might be more compelling if a federal judge could descend as a *deus ex machina* to whisper in the ears of officers on the scene about the application of precedent before a shot is ever fired. But in the world in which we actually live, officers must make split-second decisions regarding the use of force, and a reasonable officer could have understood *Blanford* as

---

[5] The concurrence fails to note other distinctions between *Blanford* and this case, such as the fact that Hughes was just a few feet away from a potential victim, whereas Blanford was 20 to 25 feet away from the police and there was no known third party at risk. *Blanford*, 406 F.3d at 1112–13. This distinction highlights the need for even faster decision-making and action on Officer Kisela's part.

recognizing that deadly force could be used in the situation Officer Kisela faced.

V

By failing to take this case en banc, we unfortunately repeat our error of framing clearly established law at too high a level of generality, divorced from the specific context of the situation facing the officer. *Sheehan*, 135 S. Ct. at 1775–76 ("We have repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality."); *al-Kidd*, 563 U.S. at 742 (same; citation omitted); *Brosseau*, 543 U.S. 194, 198–99 (reversing the Ninth Circuit for relying on "the general tests" for excessive force to evaluate clearly established law).[6] More unfortunate still, we do so by over-reading *Deorle*, the exact same case that we erroneously over-extended in *Sheehan*. The panel

---

[6] Indeed, just days ago the Supreme Court rejected yet again this court's approach of defining clearly established law at too high a level of generality. *See Petersen v. Lewis County*, 663 F. App'x 531 (9th Cir. 2016), *cert. granted and judgment vacated sub nom. McKnight v. Peterson*, No. 16-1003, (U.S. June 12, 2017). In *Peterson*, a police officer responded to a 911 call reporting that an individual was using a large knife to stab the front door of a mobile home. *Petersen v. Lewis County*, No. C12-5908, 2014 WL 584005, at *1–2 (W.D. Wash. Feb. 13, 2014). The officer believed, incorrectly as it turned out, that the suspect had a knife. *Id.* at *2. The suspect failed to comply with the officer's orders to get on the ground and took two steps towards the officer, who was 20 to 25 feet away, at which point the officer shot the suspect to stop his approach. *Id. Petersen* defined clearly established law at a high level: it is clearly established that an officer may not use deadly force without probable cause to believe that the plaintiff posed a threat of serious physical harm, and the officer "did not have probable cause to use deadly force and therefore acted in violation of clearly established law." 663 F. App'x at 532. The panel here takes a similarly erroneous approach, and thus also invites vacatur, if not summary reversal.

opinion that we leave in place contradicts *White*, *Mullenix*, *Sheehan*, *al-Kidd*, *Brosseau*, and multiple other Supreme Court precedents instructing us to "identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *White*, 137 S. Ct. at 552.

The panel would have us believe this is all inconsequential—"[t]he application of qualified immunity," it assures us, simply "will depend upon the facts as determined by a jury." *Hughes*, 841 F.3d at 1090. But there is no set of facts for which Hughes has proffered evidence that would establish a clear violation of the Fourth Amendment as of the date of Officer Kisela's conduct, and qualified immunity is immunity *from suit*, not just a defense to liability. *Pearson*, 555 U.S. at 237. In this situation, "[o]ur grand business undoubtedly is . . . to do what lies clearly at hand." Thomas Carlyle, *Signs of the Times*, 49 Edinburgh Rev. 439, 439 (1829). Because it is apparent on the summary judgment record that qualified immunity, when properly applied, shields Officer Kisela from suit in this situation, I would afford him the immunity to which the law entitles him. I therefore dissent from the denial of rehearing en banc.

---

## OPINION

SESSIONS, District Judge:

After receiving a report of a person hacking at a tree with a knife, three members of the University of Arizona Police Department (UAPD) responded to the scene. Upon their arrival, the officers saw Plaintiff Amy Hughes carrying a

large kitchen knife.  Ms. Hughes then began to walk toward another woman, Sharon Chadwick, at which point the police yelled for her to drop the knife.  Ms. Hughes did not comply.  Ms. Chadwick has submitted an affidavit in which she describes Ms. Hughes's demeanor at the time as composed and non-threatening.   Multiple witnesses attest that Ms. Hughes never raised the knife as she neared Ms. Chadwick.  Unable to approach the two women because of a chain-link fence, defendant and UAPD Corporal Andrew Kisela shot Ms. Hughes four times.

Ms. Hughes brings suit under 42 U.S.C. § 1983 claiming excessive force in violation of her constitutional rights.  The district court granted summary judgment in favor of Corporal Kisela, concluding that his actions were reasonable and that he was entitled to qualified immunity.  The facts when viewed in the light most favorable to Ms. Hughes do not support the district court's decision.  We reverse and remand for further proceedings.

**FACTUAL BACKGROUND**

On May 21, 2010, Corporal Kisela and UAPD officer-in-training Alex Garcia were monitoring the Tucson Police Department radio when they heard a "check welfare" call regarding a woman reportedly hacking at a tree with a large knife.  The officers drove to the location and were told by the reporting party that the person with the knife had been acting erratically.  UAPD Officer Lindsay Kunz also responded to the call.

The following events occurred in less than one minute.  Soon after the three officers arrived, Amy Hughes emerged from her house carrying a large kitchen knife.  Sharon

Chadwick was standing outside the house in the vicinity of
the driveway. According to Ms. Chadwick's affidavit, Ms.
Hughes was composed and content as she exited the house,
holding the kitchen knife down to her side with the blade
pointing backwards. Ms. Chadwick submits that she was
never in fear, and did not feel that Ms. Hughes was a threat.

As Ms. Hughes approached Ms. Chadwick, the officers
each drew their guns and ordered her to drop the knife.
Although Corporal Kisela contends that the officers yelled
numerous time for Ms. Hughes to drop the knife, Ms.
Chadwick recalls hearing only two commands in quick
succession. Ms. Hughes did not drop the knife and continued
to move toward Ms. Chadwick. Corporal Kisela recalls
seeing Ms. Hughes raise the knife as if to attack. Officers
Garcia and Kunz later told investigators that they did not see
Ms. Hughes raise the knife.

A chain link fence at the edge of the property prevented
the officers from getting any closer to the two women.
Because the top of the fence obstructed his aim, Corporal
Kisela dropped down and fired four shots through the fence.
Each of the shots struck Ms. Hughes, causing her to fall at
Ms. Chadwick's feet. Her injuries were not fatal.

In an interview with police after the shooting, Ms.
Chadwick explained that she and Ms. Hughes lived together,
and that she had managed Ms. Hughes's behavior in the past.
She also informed police that Ms. Hughes had been
diagnosed with bipolar disorder and was taking medication.
Ms. Chadwick believes that Ms. Hughes did not understand
what was happening when the police yelled for her to drop
the knife. She also believes that Ms. Hughes would have

given her the knife if asked, and that the police should have afforded her that opportunity.

## STANDARD OF REVIEW

A district court's grant of a motion for summary judgment is reviewed de novo. *Colwell v. Bannister*, 763 F.3d 1060, 1065 (9th Cir. 2014). "Summary judgment is appropriate only 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Stoot v. City of Everett*, 582 F.3d 910, 918 (9th Cir. 2009) (quoting Fed. R. Civ. P. 56(c)). In reviewing a summary judgment ruling, we draw all reasonable inferences in favor of the non-moving party. *Galvin v. Hay*, 374 F.3d 739, 745 (9th Cir. 2004). We are obligated to construe the record in the light most favorable to the party opposing summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). We review an officer's entitlement to qualified immunity de novo. *Glenn v. Washington Cty.*, 673 F.3d 864, 870 (9th Cir. 2011).

## DISCUSSION

### I. Excessive Force

When evaluating a Fourth Amendment claim of excessive force, courts ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham v. Connor*, 490 U.S. 386, 397 (1989). This inquiry "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the

countervailing governmental interests at stake." *Id.* at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. Reasonableness therefore "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396.

The strength of the government's interest in the force used is evaluated by examining three primary factors: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether [s]he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citing *Garner*, 471 U.S. at 8–9). The "'most important' factor under *Graham* is whether the suspect posed an 'immediate threat to the safety of officers or third parties.'" *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013) (quoting *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)).

The factors identified in *Graham* are not exclusive. *See Bryan*, 630 F.3d at 826. When assessing the officer's conduct, a court must examine "the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'" *Id.* (quoting *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994)). Other relevant factors may include the availability of less intrusive force, whether proper warnings were given, and whether it should have been apparent to the officer that the subject of the force used was mentally disturbed. *See, e.g.*, *Bryan*, 630 F.3d at 831; *Deorle v.*

*Rutherford*, 272 F.3d 1272, 1282–83 (9th Cir. 2001). With respect to the possibility of less intrusive force, officers need not employ the least intrusive means available so long as they act within a range of reasonable conduct. *See Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

In this case, when viewing the facts in the light most favorable to Ms. Hughes, the record does not support Corporal Kisela's perception of an immediate threat. Officer Garcia told Tucson police that Ms. Hughes did not raise the knife and did not make any aggressive or threatening actions toward Ms. Chadwick. Officer Kunz similarly did not see Ms. Hughes raise her arm. Ms. Chadwick describes Ms. Hughes as having been composed and non-threatening immediately prior to the shooting.[1]

Corporal Kisela was undoubtedly concerned for Ms. Chadwick's safety. He had received a report of a person with a knife acting erratically, and soon thereafter saw that same person still holding a knife and approaching another individual. In some situations, "[i]f the person is armed . . . a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat." *George*, 736 F.3d at 838. Nonetheless, "a simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Deorle*, 272 F.3d at 1281 ("A desire to resolve quickly a potentially dangerous situation is not the type of governmental interest

---

[1] While Ms. Chadwick's description may not be entirely consistent with some of her other statements in the record, "we must draw all justifiable inferences in favor of [Ms. Hughes], including questions of credibility and of the weight to be accorded particular evidence." *Masson v. New Yorker Magazine, Inc*., 501 U.S. 496, 520 (1991).

that, standing alone, justifies the use of force that may cause serious injury."); *see also Harris v. Roderick*, 126 F.3d 1189, 1204 (9th Cir. 1997) ("Law enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed."). Here, viewing those "objective factors" in a light most favorable to Ms. Hughes, a rational jury could find that she did not present an immediate threat to the safety of others, and that Corporal Kisela's response was unreasonable. *Id.*

The question of the severity of the crime being committed also weighs in Ms. Hughes's favor. The three officers present at the time of the shooting were responding to a "check welfare" call. No crime was reported. As in *Deorle*, where the police shot a mentally ill man acting strangely, the officers arrived "not to arrest [Ms. Hughes], but to investigate [her] peculiar behavior." 272 F.3d at 1280–81. And also as in *Deorle*, this was not a situation of a "lone police officer suddenly confronted by a dangerous armed felon . . . ." *Id.* at 1283. The majority in *Deorle* noted that "[t]he character of the offense is often an important consideration in determining whether the use of force was justified," and ultimately concluded that "where the crime being committed, if any, was minor and the danger to . . . others appear to have been minimal," the governmental interest in using force was "clearly not substantial." *Id.* at 1280–82. A rational jury, viewing the facts in a light most favorable to Ms. Hughes, could reach the same conclusion here.

The third factor cited in *Graham*, whether the suspect was resisting or seeking to evade arrest, does not apply as the events in this case occurred too quickly for the officers to make an arrest attempt. A related issue is Ms. Hughes's disregard of the officers' commands to drop the knife. It is

undisputed that officers yelled at least twice for her to drop the knife. If the case goes to trial, the jury may hear evidence of several additional warnings. At summary judgment, however, the Chadwick affidavit plays an important role on this point. Ms. Chadwick heard only two warnings in quick succession, and perceived that Ms. Hughes did not understand what was happening. Whether the police should have perceived this is a question for the jury.

At the time, the police were privy to facts suggesting that Ms. Hughes might have a mental illness. The initial report was to "check welfare" of a person trying to cut down a tree with a knife. Upon arriving at the scene, the reporting party informed Corporal Kisela that this same person was acting erratically. Just prior to the shooting, Corporal Kisela himself recalled Ms. Hughes "stumbling" toward Ms. Chadwick.

This Court has "refused to create two tracks of excessive force analysis, one for the mentally ill and one for serious criminals." *Bryan*, 630 F.3d at 829. The Court has, however, "found that even when an emotionally disturbed individual is acting out and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted . . . with a mentally ill individual." *Id.* (citation and internal quotation marks omitted). A reasonable jury could conclude, based upon the information available to Corporal Kisela at the time, that there were sufficient indications of mental illness to diminish the governmental interest in using deadly force.

Another factor to be considered is whether there were less intrusive means that could have been used before employing deadly force. As noted previously, officers "need not avail

themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable." *Henrich*, 39 F.3d at 915. However, "police are 'required to consider [w]hat other tactics if any were available,'" and whether there are "clear, reasonable and less intrusive alternatives" to the force being contemplated. *Bryan*, 630 F.3d at 831 (quoting *Headwaters Forest Def. v. Cty. of Humboldt*, 240 F.3d 1185, 1204 (9th Cir. 2000)); *see also Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005) (holding that officers should consider "alternative techniques available for subduing [a suspect] that presented a lesser threat of death or serious injury").

In this case, the record includes expert opinions about the reasonableness of using a firearm in this situation. Ms. Hughes's expert concluded that Corporal Kisela should have used his Taser, and that shooting through the fence was both dangerous and excessive. Corporal Kisela's expert opined that a Taser would likely have become tangled in the fence, and that the shooting was reasonable. It is well established that a jury may hear expert testimony in this type of case, and rely upon such evidence in assessing whether the officer's use of force was unreasonable. *See Larez v. City of Los Angeles*, 946 F.2d 630, 635 (9th Cir. 1991) (as amended) (finding that testimony of "an expert on proper police procedures and policies" was relevant and admissible). Here, the differences in the experts' opinions reinforce our conclusion that there are questions for a jury to consider in determining whether Ms. Hughes's constitutional rights were violated.

This Court has noted that "[b]ecause [the question of excessive force] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary

judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002); *see also Liston v. Cty. of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997) (as amended) ("We have held repeatedly that the reasonableness of force used is ordinarily a question of fact for the jury."). This is such a case. Material questions of fact, such as the severity of the threat, the adequacy of police warnings, and the potential for less intrusive means are plainly in dispute. *See, e.g.*, *City of Hemet*, 394 F.3d at 703 ("Considering the severity and extent of the force used, the three basic *Graham* factors, and the availability of other means of accomplishing the arrest, it is evident that the question whether the force used here was reasonable is a matter that cannot be resolved in favor of the defendants on summary judgment."). Corporal Kisela is not entitled to summary judgment with respect to the reasonableness of his actions.

## II. Qualified Immunity

The district court determined that because Corporal Kisela acted reasonably, it need not reach the question of qualified immunity. Nonetheless, the court commented that "under the totality of the circumstances and the standard of whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted, it appears that [Corporal Kisela's] conduct was reasonable; [Corporal Kisela] would therefore be entitled to qualified immunity." As discussed above, there are questions of fact in dispute that foreclose a finding of reasonableness as a matter of law. We therefore undertake a qualified immunity analysis.

The Supreme Court has explained that "[t]he doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity shields an officer from liability even if his or her actions resulted from "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)). The purpose of qualified immunity is to strike a balance between the competing "need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. Al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

"In determining whether an officer is entitled to qualified immunity, we consider (1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct." *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014) (citing *Pearson*, 555 U.S. at 232). Consequently, at summary judgment, an officer may be denied qualified immunity in a Section 1983 action "only if (1) the facts alleged, taken in the light most favorable to the party asserting injury, show that the officer's conduct violated a constitutional right, and (2) the right at issue was clearly

established at the time of the incident such that a reasonable officer would have understood [his] conduct to be unlawful in that situation." *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011).

Here, the question of a constitutional violation involves disputed facts which, when viewed most favorably to Ms. Hughes, could support a rational jury finding in her favor. We therefore move to the second question: whether the right at issue was clearly established such that a reasonable officer would have understood his actions were unlawful. The law does not "require a case directly on point, but existing precedent must have placed the . . . constitutional question beyond debate." *al-Kidd*, 563 U.S. at 740. That said, this Court has acknowledged that qualified immunity may be denied in novel circumstances. *See Mattos v. Agarano*, 661 F.3d 433, 442 (9th Cir. 2011) (en banc) (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). "Otherwise, officers would escape responsibility for the most egregious forms of conduct simply because there was no case on all fours prohibiting that particular manifestation of unconstitutional conduct." *Deorle*, 272 F.3d at 1286; *see also Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (stating that "in an obvious case, these [*Graham*] standards can 'clearly establish' the answer, even without a body of relevant case law").

The most analogous Ninth Circuit case is *Glenn*, 673 F.3d 864, in which an eighteen-year-old man was shot in his driveway by police officers. Police received a report of an agitated, intoxicated man carrying a pocket knife and threatening to kill himself. Although at least one officer was told that the man had calmed down, when police saw him holding the knife to his own neck they drew their guns and

screamed for him to drop it. Additional officers arrived at the scene, one of whom shot the man with several beanbags. The impact of the beanbags caused the man to move away from the beanbag fire and toward the house in which his parents were standing. As police had determined that if the man "made a move toward the house with his parents inside, they would use deadly force," they opened fire and killed him. *Glenn*, 673 F.3d at 869.

*Glenn* is similar to this case in several respects. For example: it was not clear that the decedent in *Glenn* was actually threatening anyone; no serious crime was being committed; there was no effort to resist or evade arrest aside from failing to put down the knife; the failure to drop the knife may have been the result of confusion by an impaired person; and it might have been reasonable to use less intrusive force. Although the district court had granted summary judgment, this Court remanded *Glenn* for a jury trial.[2] *Id.* at 879–80.

---

[2] *Glenn* was decided on summary judgment after the incident that gave rise to this case. It concerned a shooting that occurred in 2006. The panel in *Glenn* concluded that "resolution of . . . [genuine factual] issues is crucial to a proper determination of the officers' entitlement to qualified immunity," and remanded the question whether the right was clearly established at the time of the alleged misconduct, to be decided "after the material factual disputes have been decided by the jury." 673 F.3d at 871. Although the panel stated that it was "[expressing] no opinion on the second part of the qualified immunity analysis," the remand for trial would have been improper were the officers entitled to qualified immunity on the facts most favorable to the plaintiff. *See Mattos*, 661 F.3d at 445–48, 452. We therefore read *Glenn* as at least suggestive of the state of the clearly established law at the time it was decided.

In any event, we rely on *Glenn* as illustrative, not as indicative of the clearly established law in 2010. *See* Berzon, J., concurring in the denial

*Deorle*, 272 F.3d 1272, also offers similar facts, though the plaintiff in *Deorle* was acting far more strangely than Ms. Hughes. In *Deorle*, an officer responded to a call about an individual who was drunk and behaving erratically. At different points, the man brandished a hatchet, shouted "kill me," threatened to "kick [a police officer's] ass," and walked around with an unloaded cross-bow. 272 F.3d at 1276–77. Police observed him for five to ten minutes before the man began walking towards an officer with a bottle of lighter fluid. At that point the officer fired a bean bag, permanently blinding the man and fracturing his skull in several places. *Id.* at 1277–78.

As in this case, police in *Deorle* were at the scene to investigate peculiar behavior. Some sort of mental impairment was evident, the suspect was not trying to escape, and the risk of imminent harm was in question. In denying the officer's qualified immunity defense, this Court wrote:

> Every police officer should know that it is objectively unreasonable to shoot . . . an unarmed man who: has committed no serious offense, is mentally or emotionally disturbed, has been given no warning of the imminent use of such a significant degree of force, poses no risk of flight, and presents no objectively reasonable threat to the safety of the officer or other individuals.

*Id.* at 1285.

---

of rehearing en banc, at 9–12.

Here, several of those same determinations are in dispute, namely: whether Corporal Kisela was reasonable in believing that the kitchen knife was a weapon; whether he should have suspected mental health issues; whether the warning was sufficient; and most importantly, whether it was reasonable to believe that Ms. Hughes presented a threat to Ms. Chadwick's safety.  If those questions are determined in Ms. Hughes's favor, then Corporal Kisela clearly violated her constitutional right.

Corporal Kisela claims support to the contrary from *Blanford v. Sacramento County*, 406 F.3d 1110 (9th Cir. 2005), in which police had received reports of a man in a ski mask carrying a sword through a suburban residential neighborhood.  But that case could not reasonably be relied upon as justifying shooting Ms. Hughes.  Mr. Blanford was carrying a two-and-a-half-foot-long Civil War-era cavalry saber and made "a loud growling or roaring sound." *Blanford*, 406 F.3d at 1113.  He then walked toward a residence and tried to enter after searching his pockets for keys.  Unsuccessful, he turned to a walkway, saw the police officers with guns drawn, and heard them order him to drop the sword.  The police shot the man as he rounded the far corner of the house, then again as he tried to enter through another door.  After the man continued walking, police fired a third time and severed his spine, rendering him a paraplegic. On those facts, the Court found that the officers were entitled to qualified immunity.  *Id.* at 1119.

This case, when viewing the facts in Ms. Hughes's favor, differs from *Blanford* in several critical respects.  Most importantly, in contrast to a clearly disturbed man carrying a sword, Ms. Hughes held a kitchen knife—which has a perfectly benign primary use—down at her side, and

according to Ms. Chadwick's affidavit, did not appear either angry or menacing. The only information the police had regarding her use of the knife was that she was carving a tree, not that she was threatening or hurting a person. Mr. Blanford plainly disregarded police orders to drop the weapon. Here, it was apparent to Ms. Chadwick, and there is a fact issue whether it should have been evident to the police, that Ms. Hughes did not understand what was happening when they yelled for her to drop the knife. And in *Blanford* the suspect actively evaded police, while Ms. Hughes made no such attempt to get away.

The application of qualified immunity in this case will depend upon the facts as determined by a jury. The facts, viewed in Ms. Hughes's favor, present the police shooting a woman who was committing no crime and holding a kitchen knife. While the woman with the knife may have been acting erratically, was approaching a third party, and did not immediately comply with orders to drop the knife, a rational jury—again accepting the facts in the light most favorable to Ms. Hughes—could find that she had a constitutional right to walk down her driveway holding a knife without being shot. As indicated by *Deorle* and *Harris*, as well as the Supreme Court's reference to the "obvious case," *Brosseau*, 543 U.S. at 199, that right was clearly established. Based on the disputed facts, Corporal Kisela is not entitled to qualified immunity.

## CONCLUSION

We therefore reverse the district court's grant of summary judgment and remand for a jury to determine whether Corporal Kisela's use of deadly force was lawful.

48 HUGHES V. KISELA

**REVERSED AND REMANDED**.